IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Aryee Henderson, | C/A No.: 4:20-cv-2726-SAL-TER |
| Plaintiff, | |
| v. | **ORDER** |
| Officer Cleveland, Sergeant Thomas, Officer Corley, Officer Parrish, Officer Delk, Officer Henderson, Sergeant Coaxum, and Lieutenant Anderson-Davenport, | |
| Defendants. | |

This matter is before the court for review of the January 20, 2023, Report and Recommendation of the United States Magistrate Judge Thomas E. Rogers, III, made in accordance with 28 U.S.C. § 6363(b)(1)(B) and Local Civil Rule 73.02(B)(2) (D.S.C.). [ECF No. 244.] In his Report, the magistrate judge recommended that this court should grant judgment for Defendants on Plaintiff Aryee Henderson's medical indifference claim but recommended that both of Henderson's excessive use of force claims should proceed to trial. *Id.* at 27. Henderson and Defendants objected to the Report. [ECF Nos. 258, 259.]

After a thorough review of the Report, the parties' briefing, and the relevant case law, the court adopts in part and rejects in part the magistrate judge's Report. The court finds that Defendants failed to carry their burden of proving Henderson failed to exhaust his administrative remedies. The court further determines that genuine issues of material fact exist for each excessive force claim but not the medical indifference claim. Each excessive force claim therefore may proceed to trial. The court details its reasoning below.

1

## BACKGROUND[1]

This case is about two alleged incidents where corrections officers allegedly used excessive force against Plaintiff Aryee Henderson. The first incident happened on June 20, 2019. [ECF No. 11, at 8.] Henderson went to "medical" without an escort and without any sort of restraint to receive one of his two weekly blood pressure checks. *Id.* After getting his blood pressure checked, Henderson attempted to leave by himself, but Officers Cleveland and Cabbagestalk[2] stopped him and claimed they needed to escort Henderson back to his cell. *Id.* Once the three men arrived at the Wateree Unit, which housed Henderson's cell, the officers stopped Henderson and asked him to turn around to be handcuffed before proceeding to his cell. *Id.* By his own admission, Henderson told the officers he would not turn around because it was not policy nor procedure to get handcuffed to get escorted to his cell. *Id.*

Officer Cleveland again directed Henderson to turn around to get handcuffed, and Henderson again refused this directive. *Id.* Henderson claims the officers then "jumped [him] and slammed [him] on the ground." *Id.* Officer Cleveland, who is larger than Henderson, was allegedly on top of Henderson for about three to five minutes while the officers struggled to get Henderson's

---

[1] These facts are taken in a light most favorable to Henderson, the nonmoving party. The court uses information from Henderson's Amended Complaint, his signed Declaration, and the other evidence in the record provided by both parties to the extent it does not conflict with Henderson's averments.

[2] Officer Cabbagestalk is not a party to this action. Henderson references an "Officer Capistock" throughout his Amended Complaint. But this court terminated "Officer Capistock," along with others, as a party based on the Marshal's inability to serve him. [ECF No. 63, at 1.] According to the Marshals, they could not serve Officer Capistock because the "SCDC [Office of General Counsel] cannot accept—could not find this defendant." [ECF No. 27, at 2.] Despite the court's issuance of a proper form order, ECF No. 52, Henderson failed to identify Officer Capistock as Officer Cabbagestalk in his proposed summons, ECF No. 58. As a result, the court terminated Officer Capistock as a party. [ECF No. 63.] Defendants identified Officer Capistock as Officer Cabbagestalk in their summary judgment motion. But Henderson never moved to amend his Amended Complaint to add Officer Cabbagestalk as a defendant, and he remains a non-party.

arms around his back to handcuff him. *Id.* During the struggle, officers twisted Henderson's left arm to get it behind his back, and Henderson "then surrendered so [he] [could] be handcuffed to avoid any physical injuries to his arms." *Id.* After handcuffing Henderson, the officers purportedly put two "arm locks" on Henderson, which "almost dislocat[ed] [his] shoulders." *Id.* The officers then walked Henderson to his cell and "ramm[ed] [his] head to the wing doors and walls." *Id.*

Henderson claims that the officers never received prior approval to use force against him, nor did they use any camera to capture the event. *Id.* at 8–9. He maintains that he did not threaten the officers, nor did he give them a reason to use force against him. *Id.* at 9. The officers' use of force purportedly caused Henderson "excruciating pain for several weeks in [his] shoulders and [caused] migraine headaches." *Id.* Henderson alleges that the Wateree Unit houses "the most violent and dangerous prisoners within the South Carolina Department of Corrections" and at the time of this incident was "a permanent 24/7 lockdown dorm." *Id.*

That same day, Henderson filed a Step 1 Grievance—Grievance No. BRCI 0522-19 (the 2019 Excessive Force Grievance)—alleging the above facts. *Id.* at 18. In that grievance, Henderson requested that he be moved immediately out of the Wateree Unit. *Id.* The South Carolina Department of Corrections Police Services received Henderson's grievance four days after it was filed. [ECF No. 154-3, at 1.] An agent with Police Services interviewed both Officer Cabbagestalk and Officer Cleveland in August 2019. *Id.* at 1–2, 8–13.

Officer Cabbagestalk provided Police Services with a substantively similar story as Henderson. He and Officer Cleveland were escorting Henderson back to his cell when the officers told Henderson they intended to handcuff him. *Id.* at 1. Henderson purportedly pulled away "forcibly" which caused both officers to place Henderson on the ground and detain him. *Id.* According to Officer Cabbagestalk, after the officers handcuffed Henderson, they were able to

return him to his cell without further incident. *Id.* 1–2. Officer Cleveland told Police Services that he could not recall the incident. *Id.* at 2, 11–13. Henderson provided Police Services a voluntary statement as well, and it matched the narrative in his Amended Complaint except it did not detail that his head was rammed into a door or wall. *Id.* at 15. The Police Services report concluded that the investigation "which includ[ed] statements made by the inmate as well as the Correctional Officers, along with no camera video footage of the incident" found "insufficient evidence to substantiate any of the allegations listed in the grievance." *Id.* at 3.

After the investigation, the Grievance Coordinator responded by saying Henderson's Step 1 Grievance had been processed and the warden had resolved the complaint without any further action. [ECF No. 11, at 18.] Henderson filed a Step 2 Grievance on April 1, 2020, complaining of the Grievance Coordinator's response to the Step 1 Grievance. *Id.* at 19. Corrections officials responded to the Step 2 grievance the next month and claimed that the investigation conducted by Police Services failed to "substantiate any of the allegations listed in the [Step 1] grievance." *Id.* As a result, corrections officials denied Henderson's Step 2 Grievance and noted that he may appeal the decision to the Administrative Law Court. *Id.*

The second incident took place eight months later, on February 21, 2020. *Id.* at 9. According to Henderson, he was in the Wateree Unit's Sally port speaking with Mr. Williams, a qualified mental health personnel. *Id.* During the pair's conversation, Henderson asked if he could get a pass to go to the law library. Williams informed Henderson that he would need to ask Lieutenant Anderson-Davenport, the Wateree Unit manager. *Id.* Henderson then went to Lieutenant Anderson-Davenport's office and asked her for a pass, but she purportedly began screaming at him and denied Henderson a pass. *Id.* Henderson yelled back at her, stating he "can't

take being in her unit and that [he] refuse[s] to go back in [his] cell." *Id.* Lieutenant Anderson-Davenport called the First Response team on her radio to get Henderson out of her office. *Id.*

At that time, Mr. Williams apparently called out to Henderson, asking him to join Williams in his office. *Id.* While in the Sally port area, Henderson tried to go to Mr. Williams' office but was boxed in by corrections officers. *Id.* at 10. After Henderson told one officer to "step back," Sergeant Thomas sprayed Henderson "directly" in his face with chemical munitions, known as pepper spray. *Id.* According to Henderson, Sergeant Thomas did not follow the proper procedures before he used the pepper spray. *Id.* Once he had been sprayed, multiple corrections officers "jumped [Henderson] and wrestled [him] to the ground." *Id.* Sergeant Thomas stayed on top of Henderson until the First Response team arrived. *Id.*

Once the First Response team got to the Wateree Unit, Sergeant Thomas purportedly started choking Henderson, and the responding officers handcuffed him too tightly. *Id.* While he was cuffed on the ground, the First Response officers allegedly began to punch, kick, and stomp on Henderson's "head, face, side, legs and arms" all while Sergeant Thomas was allegedly "sitting on [Henderson's] stomach choking [him]." *Id.* After about five minutes had passed, the officers purportedly stood Henderson up and continued physically assaulting him. *Id.* Mr. Williams apparently watched the entire assault and did not attempt to stop the officers. *Id.* at 10–11.

The First Response team then "dragged" Henderson out of the Wateree Unit and took him to Medical. *Id.* at 11. At Medical, Nurse Collins treated Henderson by rinsing his face and eyes with water to clean off the pepper spray. *Id.* Henderson claims that his face was only rinsed for two minutes, *id.* at 12, but medical records provide "[inmate] allowed to decontaminate [for] 15 [minutes] with [water]," ECF No. 159, at 48. Officers then took Henderson to the Restrictive Housing Unit and placed him in a holding cell. *Id.* Henderson alleges that the officers threw him

in the cell and began beating him while he was still in handcuffs. *Id.* This round of beating purportedly lasted for about three to five minutes. *Id.* Afterward, two officers allegedly ripped off Henderson's clothes. *Id.* Henderson claims that he never received any treatment for the injuries he sustained during the officers' assault. *Id.*

After a few hours in lock up, Ms. Labrador (the head Qualified Mental Health Personnel) visited Henderson. *Id.* at 12. Henderson told Ms. Labrador that he "was feeling homicidal and that [he] needed to go to the hospital [because] [he] was in extreme pain." *Id.* She told Henderson that he would have to wait in lock up for a few days "until everything cool[ed] off." *Id.* Ms. Labrador also purportedly encouraged Henderson to file a grievance. *Id.* Henderson waited in lock up and was never seen by medical to address the injuries he received from the officers. *Id.* Officers then took Henderson to a crisis intervention cell, removed all his personal possessions (including his clothing), and gave him a smock and blanket. *Id.* Despite requesting medical attention over the next two weeks, Henderson claims to have never seen a doctor for his injuries and no one documented his bruises nor injuries. *Id.* at 12–15.

On February 24, 2020, Henderson filed two Step 1 Grievances (the 2020 Grievances) related to this incident: Grievance No. BRCI 0123-20 detailing the alleged assault (the 2020 Excessive Force Grievance) and Grievance No. BRCI 0125-20 detailing the denial of medical care for his injuries (the Medical Grievance). *Id.* at 21, 23. In the 2020 Excessive Force Grievance, Henderson detailed the alleged assault by the officers, characterized it as an "emergency grievance," and requested that the officers be "criminally charged." *Id.* at 21. In the Medical Grievance, he detailed the alleged denial of medical treatment stemming from the alleged attack. *Id.* at 23. This was also characterized as an "emergency grievance." *Id.* In the Medical Grievance,

Henderson requested that "Police Services, SLED, or any law enforcement officer take pictures" of his injuries. *Id.*

The Grievance Coordinator responded to each of these grievances on March 3, 2020, and told Henderson they were being processed and returned because Henderson had failed to try to informally resolve the issue. *Id.* at 21, 23. The Coordinator then directed Henderson to file a Request to Staff Member (RTSM) before filing another grievance. *Id.* Nothing in the record suggests that Henderson filed an RTSM, additional Step 1 Grievances, nor Step 2 Grievances challenging the Grievance Coordinator's response to the 2020 Grievances.

Henderson initially filed this action on July 24, 2020, bringing various claims under 42 U.S.C. § 1983 and state law. [ECF No. 1.] After the magistrate judge issued a proper form order, ECF No. 7, Henderson filed an Amended Complaint, ECF No. 11, bringing three causes of action under § 1983 for alleged violations of his Eighth Amendment rights: (1) excessive use of force for the June 2019 incident (2019 Excessive Force Claim); (2) excessive use of force for the February 2020 incident (2020 Excessive Force Claim); and (3) medical indifference for the alleged denial of medical treatment following the February 2020 incident (Medical Indifference Claim). [ECF No. 11.] At the end of discovery, Defendants moved for summary judgment. [ECF No. 154.] Henderson responded in opposition. [ECF No. 189.] The magistrate judge then issued his Report and Recommendation. [ECF No. 244.] Both Henderson and Defendants' objected to the Report. [ECF Nos. 258, 259.] The matter is now ripe for resolution.

## REVIEW OF A MAGISTRATE JUDGE'S REPORT

The court is charged with making a de novo determination of those portions of the Report to which specific objections are made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge

with instructions. *See* 28 U.S.C. § 636(b)(1). A district court, however, only has to review de novo the specific portions of the Magistrate Judge's Report to which an objection is made. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); *Carniewski v. W. Virginia Bd. of Prob. & Parole*, 974 F.2d 1330 (4th Cir. 1992). Without specific objections to portions of the Report, this court need not explain its reasons for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

"An objection is specific if it 'enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.'" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 2017 WL 6345402, at *5 n.6 (D.S.C. 2017) (citing *One Parcel of Real Prop. Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996)). A specific objection to the Magistrate Judge's Report thus requires more than a reassertion of arguments from the complaint or a mere citation to legal authorities. *See Workman v. Perry*, No. 6:17-cv-00765-RBH, 2017 U.S. Dist. LEXIS 175597, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

"Generally stated, nonspecific objections have the same effect as would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 U.S. Dist. LEXIS 15489, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The court reviews portions "not objected to—including those portions to which only 'general and conclusory' objections have been made—for clear error." *Id.* (emphasis added) (citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

**DISCUSSION**

Henderson brings three claims against Defendants, each alleging a violation of his Eighth Amendment rights: an excessive force claim relating to a use of force incident in June 2019 and an excessive force claim and a medical indifference claim relating to a use of force incident in February 2020. [ECF No. 11.] In his Report, the magistrate judge determined that a triable issue of fact exists as to both excessive force claims, but that Henderson failed to exhaust his administrative remedies for his medical indifference claim. [ECF No. 244, at 27.]

Henderson objects to the Report's conclusion that he failed to exhaust his administrative remedies, arguing the magistrate judge improperly gave greater weight to Felicia McKie's affidavit over the evidence Henderson provided. [ECF No. 258, at 4.] Defendants also object to the Report on at least three grounds: (1) the Report disregards their qualified immunity argument; (2) no triable issue of fact exists as to either excessive force claim; and (3) Henderson failed to exhaust his administrative remedies for both claims stemming from the February 2020 incident. [ECF No. 259.]

As all the parties raise concerns with the magistrate judge's determination of Henderson's exhaustion, the court first addresses that issue. The court finds that Defendants failed to carry their burden of showing Henderson failed to properly exhaust his grievances relating to the February 2020 incident. As a result, the court must determine whether a genuine issue of material fact exists on each claim. After reviewing the merits of Henderson's claims, along with the parties' objections, the court finds that Defendants are entitled to judgment on Henderson's Medical Indifference claim but not the Excessive Force Claims.

### I.     Defendants failed to meet their burden of proving Henderson failed to exhaust his available administrative remedies.

All parties agree that Henderson properly exhausted his available administrative remedies for his 2019 Excessive Force Grievance. So, this section only examines whether Defendants have met their burden of proving Henderson failed to exhaust his 2020 Grievances. To start, the court provides the legal standard for exhaustion of administrative remedies before filing a prison conditions action. The court next lays out the SCDC Grievance Policy. Then the court addresses whether Defendants met their burden of proof. To do that, the court addresses whether Henderson's 2020 Grievances are emergency grievances or whether they allege criminal activity. Finding that the 2020 Grievances allege criminal activity, the court then determines Defendants failed to carry their burden of proof.

#### A.  Exhaustion of remedies legal standard.

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), requires prisoners bringing actions relating to prison conditions to exhaust all "such administrative remedies as are available." For Henderson to exhaust his administrative remedies, he must "[use] all steps that [the South Carolina Department of Corrections] holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (citations omitted). That means "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). And Defendants have the burden of proving Henderson failed to properly exhaust the remedies provided by the South Carolina Department of Corrections. *See Jones*, 549 U.S. at 211–12.

#### B.  SCDC Grievance Policy

Both parties provided a copy of the SCDC Grievance Policy. [ECF Nos. 154-7; 189-2, at 48–62.] Section 13 of the Grievance Policy provides detailed steps in the grievance process.

Inmates normally must attempt to informally resolve their grievances by submitting an RTSM to the appropriate staff or supervisor within eight working days of the incident. *Id.* at 8. If informal resolution is impossible, then inmates must file a Step 1 Grievance within five working days of the alleged incident. *Id.* Once the warden responds to the Step 1 Grievance, the Inmate Grievance Coordinator must serve the response to the inmate within ten calendar days. *Id.* at 10. If the inmate is dissatisfied with the warden's response, they may appeal the decision to either an Office Director or Deputy Director by filing a Step 2 Grievance within five days of receiving the response. *Id.* The responsible official then must render a final decision within ninety days from the date the Grievance Coordinator received the appeal. *Id.* This final decision serves as SCDC's final agency action. *Id.* Even so, inmates may appeal the Step 2 Grievance decision to the administrative law court. *Id.* Such an appeal is the end of the normal grievance process.

But the Grievance Policy acknowledges that there are at least three scenarios that do not require informal resolution and a different process applies: (1) appeals of a disciplinary conviction; (2) appeals of a custody reduction; or (3) when the inmate is alleging criminal activity. *Id.* at 8. Relevant here, the Grievance Policy details how grievances alleging criminal activity are administered. If a grievance alleges criminal activity, it is immediately referred to the Chief of the Inmate Grievance Branch, or their designee. *Id.* at 11.

The Grievance Coordinator must note on the grievance that it has been forwarded to the Inmate Grievance Branch for possible investigation. *Id.* The Inmate Grievance Branch then must "consult with the Division of Investigations to determine if a criminal investigation would be appropriate." *Id.* at 11–12. If an investigation *is* appropriate, the grievance is forwarded to the Division of Investigations and will be held in abeyance pending resolution of the Division's investigation or review. *Id.* at 12. If an investigation *is unnecessary*, "the grievance will be

processed *in accordance with the procedures contained herein.*" *Id.* (emphasis added). If the Division of Investigations finds that the South Carolina Law Enforcement Division should investigate or review the grievance, the warden will note that in a Step 1 response. *Id.* Once SLED finalizes its investigation, officials will return the results to the grievant in a Step 2 response. *Id.* This is the final agency decision, but the grievant may appeal it to the administrative law court. *Id.*

The Grievance Policy further establishes a different procedure for "emergency grievances." *Id.* at 11. According to the Policy, an emergency "encompass[es], but is not limited to, situations, actions or conditions in which a person's health, safety, or welfare is threatened or in serious danger." *Id.* The inmate filing an emergency grievance bears the responsibility "to demonstrate the factors creating the substantial risk of personal injury or other serious and irreparable harm." *Id.* Once the Grievance Coordinator receives a grievance alleging an emergency, he will forward it to the Chief of the Inmate Grievance Branch "to determine if a substantial risk or serious harm is present and warrants the grievance being processed as an 'emergency.'" *Id.* If the grievance is treated as an emergency, the responsible officials must respond to the inmate within seven working days of receiving the complaint rather than the normal forty-five days. *Id.* If the grievance is not seen an as emergency, the Grievance Coordinator must note that in his response and treat the grievance "routinely . . . as if it were a normal grievance." *Id.*

### C. Defendants failed to meet their burden.

Against this backdrop, the court must determine whether Defendants carried their burden of proving Henderson failed to exhaust his available administrative remedies. *See Jones*, 549 U.S. at 211–12. The only dispute is whether Henderson properly exhausted his available remedies for the 2020 Grievances. In their summary judgment motion, Defendants argue that because Henderson failed to attempt informal resolution of his grievances, "[a]s clearly laid out in the

SCDC 'Inmate Grievance System' policy," he "brazenly disregarded the instructions and grievance policy" and improperly filed suit. [ECF No. 154-1, at 10.]

Defendants also provide the affidavit of Felicia McKie, the Chief of the Inmate Grievance Branch of the Office of General Counsel for SCDC. [ECF No. 154-6.] In her affidavit, Ms. McKie echoes Defendants' argument and claims that, because Henderson failed to file a new Step 1 Grievance with an attached RTSM, he failed to properly exhaust his administrative remedies. *Id.* at 3. Defendants thus argue they are entitled to summary judgment on Henderson's excessive force claim and medical indifference claim resulting from the February 2020 incident. *Id.* at 10–11.

Henderson disagrees and argues in his response brief that the Grievance Coordinator did not properly handle the two 2020 grievances. [ECF No. 189, at 1–5.] Henderson first claims that the Medical Grievance was an emergency grievance, and the Grievance Coordinator did not treat it as such. *Id.* at 2. Henderson then argues that "Defendants tried to cover-up their criminal acts by denying [him] medical treatment." *Id.* And finally, even though the Grievance Coordinator incorrectly handled the Medical Grievance, Henderson claims that he *did* informally resolve it by telling Ms. Labrador that he was in pain and needed medical attention. *Id.* at 3. With respect to his 2020 Excessive Force Grievance, Henderson argues that because it alleged criminal activity, he did not need to attempt informal resolution. *Id.* at 4. Henderson concluded by arguing that because the Grievance Coordinator mishandled the grievances, the administrative remedies were no longer available to him, so he need not exhaust them. *Id.* at 5.

The magistrate judge split the difference and recommended that Henderson could proceed with his 2020 Excessive Force Claim, but that he had not properly exhausted his administrative remedies for the Medical Indifference Claim. [ECF No. 244, at 20, 26–27.] The magistrate judge claimed that "it is undisputed that [Henderson] failed to exhaust by filing a Step One and Step Two

Grievance because the Step One grievance form was returned to [him] for failing to attach an RTSM even though he alleged criminal activity." *Id.* at 19. And then he indicated, "[t]he issue becomes whether the administrative remedies were available to [Henderson]." *Id.* The magistrate judge also concluded that summary judgment should be denied as to exhaustion on this claim because "Defendants did not address [Henderson's] argument that because he was alleging criminal activity[,] he was not required to initially attempt to resolve grievances informally[.]" *Id.* at 20. So, it seems that the magistrate judge based his recommendation on either unavailability or Defendants' failure to meet their burden of proof.

As for the Medical Grievance, the magistrate judge was unequivocal. He concluded that the SCDC Grievance Policy does not exempt emergency grievances from the informal resolution requirement. *Id.* at 24–25. And because it would still be subject to informal resolution, "[Henderson] has failed to exhaust his administrative remedies." *Id.* at 25. The magistrate judge did not address Henderson's claim that he attempted to informally resolve the issue with Ms. Labrador. Nor did the magistrate judge discuss whether the Medical Grievance alleged criminal activity.

Before the court addresses the merits of the parties' objections, it must first resolve a few outstanding issues: (1) whether Henderson's 2020 Grievances were, in fact, emergency grievances, and, if they were, did Henderson need to attempt informal resolution; and (2) whether both 2020 Grievances allege criminal activity. After resolving these issues, the court then examines whether Defendants have met their burden to show Henderson did not properly exhaust.

### 1.  Are Henderson's 2020 Grievances emergency grievances?

To start, the court finds it is unlikely that Henderson's 2020 Grievances constitute emergency grievances as defined by the SCDC Grievance Policy. Henderson noted on each 2020

Grievances that he was filing it as an "EMERGENCY GRIEVANCE." [ECF No. 189-2, at 30, 31.] The SCDC Grievance Policy defines an emergency grievance as "any complaint which, if handled according to the regular time limits required by the inmate grievance system, would subject an inmate to substantial risk of personal injury or to other serious and irreparable harm." [ECF No. 154-7, at 15.] As the court explained above, the emergency grievance process differs from the normal grievance process by requiring a warden to expedite their response from forty-five days to seven days. *Id.* at 10–11.

But the burden is on the grievant to detail the factors establishing the emergency in their Step 1 Grievance. *Id.* at 11. Henderson detailed the alleged assault by officers and the later denial of medical treatment in the 2020 Grievances. In his opposition brief, Henderson argues this sufficiently established the Policy's requirement, as he showed his "health and welfare was threatened and [was] in serious danger." [ECF No. 189, at 2.] As a matter of interpretation, it seems that the SCDC Grievance Policy requires emergency grievances to complain of some *future or ongoing* event rather than a past incident. That forward-looking focus is shown by the Policy's requirement of an abbreviated timeline for the warden's response, so corrections officers may resolve a meritorious grievance before the grievant is seriously injured or harmed. With that in mind, it is unlikely that Henderson's 2020 Grievances are properly considered emergency grievances as they detail a *previous* incident of a use of force and denial of medical treatment with no mention of any future threat.

But that decision should have been made by the Chief, or her designee, of the Inmate Grievance Branch, and then that decision should have been communicated to Henderson by the Grievance Coordinator. *See* [ECF No. 154-7, at 11.] The Grievance Coordinator processed and returned both 2020 Grievances for failing to attach an RTSM and instructed Henderson to refile

with corresponding RTSMs. [ECF No. 189-2, at 30, 31.] But the responses never mentioned the emergency status of the 2020 Grievances. *Id.* While the magistrate judge found that the SCDC Grievance Policy does not seem to exclude the requirement to attempt informal resolution from emergency grievances, the court finds that the Policy is ambiguous at best. But the court need not resolve that issue because the court finds that Henderson's 2020 Grievances would still not require informal resolution as they both allege criminal activity.

2.     The 2020 Grievances sufficiently allege criminal activity.

Both of Henderson's 2020 Grievances allege criminal activity, which exempts them from the informal resolution requirement. The 2020 Excessive Force Grievance details the alleged assault by several officers that lasted between six and ten minutes at two locations in the institution. [ECF No. 189-2, at 30.] In that grievance, Henderson requested that "all responsible officials be fired *and criminally charged with lynching by mob.* That [he] speak and be interviewed by Police Services, SLED, or any local law enforcement officer, effective immediately[.]" *Id.* (emphasis added). The court need not even engage in a liberal construction of this grievance to find it alleges criminal activity.

The Medical Grievance likewise alleges criminal activity. To start, that grievance was filed simultaneously with the 2020 Excessive Force Grievance and described the same alleged improper use of force by corrections officers. *Id.* at 31. The court need not determine that merely alleging an assault by an officer always alleges criminal activity because Henderson requested that "Police Services, SLED, or any law enforcement officer take pictures of his marks and bruises effective immediately." *Id.* Taken together, Henderson's allegations that he was beaten by officers, plus his request that law enforcement investigate his injuries, sufficiently allege criminal activity. The court therefore finds that both 2020 Grievances allege criminal activity and are exempted from the

16

informal resolution requirement per the SCDC Grievance Policy. [ECF No. 154-7, at 8.] Against this conclusion, the court next examines whether Henderson properly exhausted his available administrative remedies.

### 3. Did Defendants meet their burden of proving Henderson did not exhaust?

Despite their objections to the contrary, Defendants have not met their burden of proving Henderson failed to properly exhaust his available administrative remedies. In their objections, Defendants argue "that the key underlying fact remains that ultimately, [Henderson] was specifically instructed on how to resubmit his emergency grievances at the same level and retained the option to escalate them to Step 2 if he disagreed with the results." [ECF No. 259, at 7.] As the court discussed above, Henderson did not have to attempt informal resolution as he sufficiently alleged criminal activity. As a result, Defendants' contrary claim is still erroneous. And because Defendants have not explained why they improperly handled Henderson's 2020 Grievances, the court finds that they have failed to meet their burden to prove that Henderson's additional administrative remedies were actually available to him. Without meeting this burden, Defendants cannot show that Henderson failed to exhaust his administrative remedies. The court therefore finds that summary judgment is not warranted on these grounds.[3] The court must now decide whether genuine issues of material fact exist on each of Henderson's claims.

---

[3] To the extent Defendants try and argue that Henderson could have properly exhausted by filing a Step 2 Grievance challenging the Grievance Coordinator's response to both 2020 Grievances, the court need not consider this argument as it was not properly before the magistrate judge. *See ContraVest Inc. v. Mt. Hawley Ins. Co.*, 273 F. Supp. 3d 607, 620 (D.S.C. 2017) (explaining that district courts need not address arguments raised for the first time in objections to a magistrate judge's Report).

## II.     Henderson's excessive force claims may proceed to trial, but Defendants are entitled to judgment on Henderson's medical indifference claim.

Because none of Henderson's claims are subject to dismissal for failing to exhaust, the court must decide whether Defendants are entitled to judgment on them. The court starts by addressing the Medical Indifference Claim and then addresses the use of force claims.

### A.     The court overrules Henderson's objection because it is not specific and lacks merit and finds Defendants are entitled to judgment on the Medical Indifference Claim.

The court need only review the magistrate judge's recommendation to grant judgment on Henderson's Medical Indifference claim for clear error because Henderson did not specifically object to that portion of the Report. While the magistrate judge recommended judgment for Defendants on this claim for Henderson's alleged failure to exhaust, he also recommended this court grant judgment on the merits. [ECF No. 244, at 25 ("Even if [] this issue was found to be exhausted due to unavailable administrative remedies or excused for non-exhaustion, the claim would fail.").] Because the evidence shows Henderson was seen by health professionals many times following the February 2020 incident, the magistrate judge concluded "there is no evidence that [Henderson] was denied any necessary treatment by these Defendants." *Id.* at 26. As a result, he recommended that this court grant judgment for Defendants on this claim.

While Henderson objects to the magistrate judge's recommendation that this court should grant judgment for Defendants on the exhaustion issue, he only vaguely addresses the magistrate judge's recommendation on the merits. In his objections, Henderson titled a section "Exhaustion as to Claims of Medical Indifference," but that section runs the entire length of his brief. The only portion of the objections that the court could even consider as addressing the magistrate judge's merits recommendation is the paragraph spanning the last two pages of the brief. *See* [ECF No. 258, at 5–6.] But this paragraph merely rehashes the same arguments Henderson made in his

opposition brief. [ECF No. 189, 8–9.] As a result, the court need not review de novo this portion

of the Report. *See Howard v. Saul*, 408 F. Supp. 3d 721, 726 (D.S.C. 2019) (quoting *Abou-Hussein*

*v. Mabus*, 2010 WL 4340935, at *1 (D.S.C. Oct. 28, 2010), aff'd, 414 F. App'x 518 (4th Cir. 2011)

("Courts will not find specific objections where parties 'merely restate word for word or rehash

the same arguments presented in [their] filings related to summary judgment.'").

Even if Henderson specifically objects to the Report, the court finds that his objection lacks

merit. To survive summary judgment, Henderson must provide evidence to satisfy both the

objective and subjective prongs of his Medical Indifference Claim. As to the objective prong,

Henderson must show that "the deprivation alleged [was], objectively, 'sufficiently serious.'"

*Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Famer v. Brennan*, 511 U.S. 825,

832 (1994)). Henderson can meet this objective prong by providing evidence that his injuries had

either "been diagnosed by a physician as mandating treatment or . . . [were] so obvious that even

a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d

225, 241 (4th Cir. 2008). For the subjective prong, Henderson must show that the depriving

officials "[were] 'aware of facts from which the inference could be drawn that a substantial risk of

serious harm existed, <u>and</u> . . . drew that inference." *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511

U.S. at 837) (cleaned up).

Assuming without deciding that Henderson sufficiently provides evidence to meet the

above standards, he still must properly sue the responsible officials. "Although § 1983 must be

read against the background of tort liability that makes a man responsible for the natural

consequences of his actions, liability will only lie where it is affirmatively shown that the official

charged acted personally in the deprivation of the plaintiffs' rights." *Wilcox v. Brown*, 877 F.3d

161, 170 (4th Cir. 2017) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). As a

result, "[a] medical treatment claim cannot be brought against non-medical personnel, however, unless they were personally involved with a denial of treatment or deliberately interfered with prison doctors' treatment." *Wynn v. Mundo*, 367 F. Supp. 2d 832, 837 (M.D.N.C. 2005) (citing *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)). But a review of the record shows that Henderson fails to sue the responsible officials.

As it stands, Henderson's Amended Complaint only names these defendants: Officers Cleveland, Corley, Parrish, Delk, and Henderson, Sergeants Thomas and Coaxum, and Lieutenant Anderson-Davenport. [ECF Nos. 11; 63.] And while Henderson claims these individuals either beat him or failed to intervene to stop the assault, Henderson does not allege they failed to provide him medical treatment. *See generally* [ECF No. 11, at 8–15.] At the same time, Henderson *does* allege he asked several medical personnel for assistance with his injuries: Ms. Labrador (the head Qualified Mental Health Professional), Ms. Lyons (Mental Health Officer), Nurse Obina, Ms. Williams (QMHP), Mr. Stevenson (QMHP), Dr. Stephanie Chapman (Psych Doctor), Ms. Owens (MHO), and another "Jane Doe" QMHP. *Id.* at 12–15. In fact, Henderson assigned blame to Ms. Labrador for the ultimate denial of his treatment by claiming he believed she "had [him] on [crisis intervention] status within [the] RHU for so long . . . because she wanted me to languish in pain . . . so [he] [could] heal up before being admitted to CSU so [he] [wouldn't] have any physical evidence or proof of a prison guard assault." *Id.* at 14.

But Henderson did not sue Ms. Labrador. Nor did he sue any of the other medical professionals that he asked for assistance. Henderson, instead, only sued the officers that allegedly assaulted him. And even more, Henderson provides no evidence that the officers had any interaction with him regarding his medical status after the assault took place. By failing to allege any involvement by Defendants', Henderson fails to sustain his Medical Indifference Claim. The

court thus overrules Henderson's objection and adopts the recommendation of the magistrate judge. Defendants, therefore, are entitled to judgment on this claim.

### B. Genuine issues of material fact preclude judgment for Defendants on each excessive use of force claim.

The magistrate judge recommended Henderson's excessive force claims proceed to trial as genuine issues of material fact preclude summary judgment. [ECF No. 244, at 27.] Though Defendants filed "objections" to the Report, their "objections" are improper. As the magistrate judge noted, Defendants are required to point to specific portions of the magistrate judge's Report containing error. [ECF No. 244-1.] Instead, they improperly raise new arguments and then generally claim the magistrate judge's analysis is incorrect. The only objection that could be considered specific is Defendant's argument the Report did not adequately address their claim of qualified immunity. Even then, their objection fails. The court examines each issue in turn.

1.   Defendants did not properly object to the magistrate judge's Report.

There are at least three problems with Defendants' "objections." First, Defendants improperly ask the court to grant summary judgment in their favor as to Henderson's 2020 Excessive Force Claim for *the first time* in their objections. Rather than addressing Henderson's 2020 Excessive Force Claim in their summary judgment motion, Defendants focused solely on the Medical Indifference Claim. *See* [ECF No. 154-1, at 14–16.] Giving Defendants the benefit of the doubt, perhaps they only construed Henderson's Amended Complaint to allege two causes of action: one excessive force claim and one medical indifference claim. But Henderson specifically reiterated his 2020 Excessive Force Claim in his opposition brief. [ECF No. 189, at 10.] Defendants could have addressed this argument in their reply for the magistrate judge's consideration. They chose not to. Because the magistrate judge did not consider this argument, it

is not properly before this court, and the court exercises its discretion to not consider it. *See ContraVest Inc.*, 273 F. Supp. 3d at 620.

Second, Defendants argue a new legal standard in their objections. They argue "the analysis applied by the court in the Report and Recommendation failed to consider that, in making its assessment the court 'owe[s] officers wide-ranging deference in their determination that force is required to induce compliance with policies important to institutional security.'" [ECF No. 259, at 2 (quoting *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019)).] Defendants then assert "[t]he key question is 'whether the use of force could plausibly have been thought necessary.'" *Id.* (quoting *Fraley v. Davis*, No. 21-6641, 2022 WL 3210702, at *2 (4th Cir. Aug. 9, 2022)). But Defendants never argued that these standards should apply in their summary judgment motion. *See* [ECF No. 154-1, at 11–14.] As a result, Defendants fail to properly present this standard, and the court need not consider it. *See ContraVest Inc.*, 273 F. Supp. 3d at 620.

Finally, even if the court were to consider this new standard, Defendants fail to point the court to a specific portion of the magistrate judge's Report containing error. Instead, Defendants generally conclude "[w]hen this deference is applied in each of these instances, the defendants believe there is only one reasonable conclusion a jury could reach," that no officers violated Henderson's constitutional rights. [ECF No. 259, at 2–3.] Defendants then go on to "apply" this standard to each excessive force claim, but rehash the same facts already considered by the magistrate judge. *Id.* at 3–5.

As discussed above, Defendants only generally object to the Report—they do not point to specific portions of the Report. Defendants thus fail to specifically object, and the court need only review the Report for clear error. *See Orpiano*, 687 F.2d at 47 (explaining specific objections must "direct the court to a *specific* error in the magistrate's proposed findings and recommendations"

(emphasis added)). After reviewing the magistrate judge's Report for clear error, the court finds none. As a result, the court overrules Defendants "objections" and adopts the magistrate judge's findings that genuine issues of material fact preclude summary judgment.

### 2. Defendants are not entitled to qualified immunity.

The only remaining question is whether Defendants are entitled to qualified immunity. Whether Defendants are entitled to qualified immunity requires the court to conduct a two-step inquiry. *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). The court must ask "whether a constitutional right would have been violated on the facts alleged' by [Henderson]." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). The court must also ask whether the right allegedly violated "was clearly established at the time of the alleged violation." *Id.* (citing *Saucier*, 533 U.S. at 200). And these questions can be asked in any order the court wishes. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But "while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham*, 412 F.3d at 559. Because the court adopted the magistrate judge's finding that genuine issues of material fact exist as to each excessive force claim, the court finds that Defendants are not entitled to qualified immunity. Henderson's excessive force claims may proceed to trial.

### CONCLUSION

Having reviewed the Report and Recommendation, the objections, and the record before this court, and for the reasons set forth above, the court adopts the entire Report, ECF No. 244, except the portion relating to the exhaustion of the Medical Grievance, ECF No. 244 at 23–25. As a result, the court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary

Judgment. [ECF No. 154.] The court grants judgment for Defendants on Henderson's Medical

Indifference Claim but allows the two excessive force claims to proceed to trial.

**IT IS SO ORDERED.**

/s/Sherri A. Lydon

March 16, 2023                                                                  Sherri A. Lydon
Columbia, South Carolina                                          United States District Judge